United States v. Rosalyn Silveus May I proceed, Your Honor?  Good morning, Your Honor. So the police is the court. My name is David Caddy. I'm the attorney on behalf of the appellant, Rosalyn Silveus. I request three minutes for rebuttal, Your Honor. Your Honor, the first issue I'd like to delve into, and I think it's the most straightforward issue, is Ms. Silveus' conviction under county for harboring Joyce and Bill Jean. The record on this matter is irrefuted. Mr. Jean was in the country legally. He entered into a legal binding contract for residency at the Swerden Fry residence. The government then charged Ms. Silveus for harboring him at that place of residence, Your Honor. Two essential elements for a harboring conviction is one, that Ms. Silveus actually provided the shelter, which is refuted entirely by the lease. The second one is that the harboring unit's court concludes that she did provide shelter that in some way permitted him to remain in the country illegally. Do you have a weaker case if there was no lease? On the shelter issue, if the lease was only in Ms. Silveus' name? If no lease, well, yes. I'd say it's either a month-to-month or entirely in her name. If it's entirely in her name, that does hurt me on the harboring issue. However, the second element would be— So that the harboring issue is dependent on whether he had any document that said he could be there. I should say not the harboring. He provided shelter element of that offense, Your Honor. But it's not deadly in my case because the government's required proof that it substantially facilitated his remaining in the country illegally. Every agent, every single agent got the stance that the fact that they knew where Mr. Jean was living aided them in the apprehension of him. So it can't be substantially facilitating his illegal remaining in the United States if it's actually aiding law enforcement in apprehending him, Your Honor. The government seemed to make a fallback move to say, well, they came to the property and they heard a door close and they heard a branch break, and that the jury could then somehow infer that she was aiding Doris Seville Jean in remaining in the country. Isn't that the government's whole case on this? Is that one time in April of 2006 when Agent Harrison went for a visit? That is their entire case. I think it initially was that she was living there. It boils down to they heard a branch break. And I always disagree with what the standard for circumstantial evidence is. But I think this is so far even beyond what could be considered circumstantial. It's pure speculation. Nobody saw Mr. Jean. There was nothing whatsoever indicating he was there. Another point I should make, Your Honor, is that in regard to Ms. Silvetti, she never even denied that he was at the home. And that is, Agent Harrison spoke with her several times, and she never lies or says anything. He wasn't with me or anything like that. Let me press that point a little bit more. She knew that he was in the Virgin Islands illegally. Is there any dispute about that? Well, after Agent Harrison informs her that his BIA appeal was denied, initially he's there, and the agents all say he's there legally until his BIA decision is denied. That is after they sign him for that lease, and he signs that lease when he's living there legally. But is there any dispute about the fact that she knew that he was there in her residence as an illegal alien? I think the record does state Agent Harrison informed her face-to-face that his BIA decision was overturned. That was before the agents went to the house to pick him up. I think that was when they came to the home, Agent Harrison tells her that. That was the first time she knew that he, Jean, was an illegal alien? She may have known prior to that, Your Honor. I'm not recalling the specific point that she was told, but even if she does— Yes, hypothetically—I just wanted to test this out a little bit— hypothetically, let's say that she had knowledge that he was. Would—even if he were in their lease, would that not be sufficient for harboring an alien? It would not because she would not have been providing him shelter. He has a legal—he might not have a legal right to be in the United States, but as against Rosalynn Silveas and as against the landlord, he has a contractual legal right to be on that premise. So the strength of your argument is that he was on the lease to be there? That is one of the major points. So he could be there whether she was there or not? Absolutely, but she has no right to kick him out. There's nothing she can do legally, and she's not an agent in the government, and the government can't make you do what is essentially their job. How about the notion of concealing? Exactly—I don't think there's any concealing here. She's never, as an agent, testified. You're saying the evidence is insufficient. Shutting the door—I think the testimony was she more or less shut the door in his face, heard footsteps, someone running, and a branch breaking, but no one saw Dorson Bullsheen? Exactly, and that is totally insufficient as a matter of law. One, I don't know of any legal requirement that someone leave a door open. These agents are not coming with an arrest warrant. They're not coming with a search warrant. I don't know that there's a log. Any crime can be inferred from closing a door, and the— So unless we know that he was in there at some point. Exactly, and actually the government— The points have been sealed or facilitated, correct? Absolutely, and the evidence in this case, Your Honor, is that they heard branches breaking outside, so even if she's closing the door, their statement is he's outside running through the woods somewhere. So they can't have closed— She's not doing a very good job of concealing this. Absolutely. She's telling the government where he is. His name is on the lease. The government agents are all saying it's helping us to know where he is. Could you address—I don't know if anybody has further questions on that aspect, but could you— Yes, go ahead. Yeah, I just have one on the same subject. Could she not be charged with harboring when John was with her in St. John and in her vehicle coming back towards St. Thomas? Well, Your Honor, the indictment is specifically for harboring him at the sorting fry home, not for having him in the vehicle. I don't know if that would have been the case. I don't know if that could have been the case, but nobody has testified that his being in the car anyway facilitated his remaining in the United States illegally. Okay, so the harboring count relates solely to the residence, not to the trip from St. John? Absolutely, specifically to his remaining at that residence, Your Honor. Could you address the validity of the arrest? My understanding is that the suppression hearing, the sole evidence that was offered for the government was Agent Harrison, who testified as to what others had done in response to the tip. Is that correct that that's the sole evidence? That is the sole evidence, and I know we went over this earlier in the week. The reliance on tip and hearsay is admissible, but I think, as I cited in my brief, that the court is permitted to then review evidence that came out during the trial and review in that suppression room. And what we find out is that the two things that the court relied on, one saying it was a border search, it was clearly not a border search, and secondly that they made this arrest because the occupants of the vehicle were wet and somehow the agents could infer from the fact that they were wet that they had just come off a boat from another country. Could you focus on the border search aspect of this? I guess that's what the district court found. Could you address that? Absolutely. There is no border search in this situation, and here is the reason. One, the government has admitted, its agents all testified, that this is a boat coming in from St. John to St. Thomas. That is an intra-islands travel. I think I cited the case, the United States versus Fort, where a plane had allegedly flown in the country from Jamaica and the police in Pennsylvania had waited a couple airports and the plane landed. There needs to be some level, some evidence for the government to believe that this boat is coming internationally, and that's completely void in this case. There's nothing. It's not even that. They actually have solid proof. They know it's coming from St. John because when the tipster calls, he says they're coming on the ferry from St. John to St. Thomas. The police don't ask where the boat's going. The agents don't ask where the boat's going. They know exactly where it's going. It's going to where the St. Thomas-St. John ferry always goes, and they drive right to that point. So I think the government— It's less than four miles apart, right? Yes, it's about three miles. The agents all admit it, and I think Attorney Potter in his argument during the suppression hearing says the fact that this boat was coming from St. John. So the government freely admits that this boat was not traveling internationally. It's certainly not a border search, and there's not one scintilla evidence to indicate that whatsoever. What evidence is there that supports the arrest? The anonymous tip in and of itself does not. And at the suppression, that's really all that was testified to. That's all. But at trial, was there any testimony that supported the probable cause for the arrest? Because it's conceded that this search, that the arrest was— the arrest is not being challenged. Oh, excuse me. The arrest is being challenged. Absolutely. It's two-fold. It's one that the agents complete a stop of this vehicle. Not when they see anything. As soon as they stop that boat, they stop everyone coming off that start to stop. When they go around and they search the boat, they have absolutely no reason to arrest Ms. Evans. They arrest her before they even— They see a blue Isuzu. They see a blue Isuzu. They see two people in the backseat of that vehicle. They see Ms. Evans. And they know her. And they know her, and she knows them. She's worked with them. She knows their immigration and deportation agents. She doesn't flee. She doesn't do anything. She actually engages the officer, and he simply arrests her based on the assumption. If this is the substance of the anonymous tip, and this is what the officers heard anonymously, and they go to the site and they see all of these things— in other words, they corroborate the information provided in the anonymous tip— isn't that sufficient to allow them to investigate further? There's two points I make. It's first that they don't make the stop, basically. They stop the boat before they see the car. There's no corroboration when this stop starts. The boat is stopped, and the agent— The stopping of the boat is not a problem. I think it is, Your Honor. I think that is a motor vehicle stop in this situation. They stop, and the agent testifies. He stops everybody on that boat. She doesn't have standing to complain of anyone other than her own stop. That's correct. That is her stop. In other words, they just said, Wait a minute, nobody get off. We're going to check this inside the boat further. Absolutely. Why is that wrong? Because they're making a motor vehicle stop based on nothing. All they have is the anonymous tip. They don't get a visual confirmation that the car is on the ferry. But they know that the SUV, a blue Isuzu, is on that boat. I think they're speculating based on the anonymous tip that it's on the boat. That's why they stop it, to go on there and check. Let me press you further, but there's only one way of finding out, which is to stop the boat and go inside and look. The other way is to wait until the cars get off the ferry, as they were going to do, get visual confirmation. They might have only seen Rosalynn Silvestre, but we don't know if they would have seen other people, or Mr. Jean in that car. What if it's not a boat? It's an airplane, and the airplane, hypothetically speaking, is coming from Miami and comes to St. Thomas. The anonymous tip is that there's an illegal alien, some dangerous fugitive. He's on that plane. He's going to land in St. Thomas. That's the information. Can't you stop, not let anybody off, and then go and investigate? That poses, I believe, a different question. I don't think so. I think, well, this is different because there's no motor vehicle on that plane, and they're actually conducting a motor vehicle stop, even though it happened on the boat. That shouldn't matter. It could be the person on the plane. This is similar to the motor vehicle. I think there's a bus case like that. I think there was a case involving a bus where there's a passenger, and they come on the bus and stop the entire bus. I'm not sure what the whole name of the case is. Yeah, I'm just curious when you can go further based on information as you verify the information along the way. Is that going to send to Terry vs. Ohio? I think we are getting into that area of a Terry stop here, and my complaint is that they make this stop at sites of Florida vs. JL. They're making this based on nothing. There's nothing verifiable when they stop this vehicle. They don't even know where the vehicle is. When does the arrest come? Let's get beyond the stop. It seems to me the arrest is based upon little other than the tip itself, or is there testimony, and I guess your colleague can answer this as well, is there anything that gives more substance to the proper cause of arrest than the tip itself? Can I see my hands up when I respond? The evidence in the case, there's nothing to support the arrest whatsoever. When they get to the vehicle, if he had seen Dorsen-Bilgeen in the car, then I think the government has a good case. But he's not in that vehicle. All they have is two individuals sitting in the back seat who are, contrary to what Agent Harrison can attest about, these people are sitting in dry clothes. There's nothing to indicate in any way that they are illegal in this country. And in fact, wasn't the tip that the two of them, that Solveigas and Dorsen-Bilgeen, were doing this? So in terms of corroboration, we don't have Dorsen-Bilgeen. We absolutely lose Dorsen-Bilgeen, and the agents have nothing on which to conclude that these two other individuals are in the car. And I do say there were only two other individuals in the car, not this person. I do have to ask you a three-individual question. If none of that is valid, none of what the officers – Let's give you two more minutes. This is a difficult case. Thank you. If none of the observations of the officers are valid, what about John, the person that they were looking for, floating in the water right next to the boat? Would that have been sufficient? I didn't hear the last part of the question. Well, John is the person that they were looking for in the aileron. Yes. And the information the officers got was that he is in the car with Solveigas on the boat going to St. John's. Yes. So let's say all of their observations were improper. Well – Then they see John floating in the water by the boat. Well, I – Isn't that sufficient? I believe that she's arrested before they even see John in the water. And I think we're putting the carpet before the horse. They certainly did not – John is not in that vehicle, so there's nothing to confirm or corroborate what this anonymous tipster said. So I don't think that's sufficient. I don't know if him floating in the water would have been sufficient to arrest her. I know later on they find his pants or something in the car. Maybe at that point you're getting into something. I don't know if they can verify how – That's why he was in the water. Yes. He doesn't want to take a swimming honor. Let me ask you, in terms of what would be the proper remedy if we agree with your – Well, let's say the border search we agree was not a border search, and that's obviously what the district court relied on. Do we remand it? Well, I would hope that we'd be reversing some of the convictions or all of the convictions based on insufficiency evidence. If that was not the case, I do think we remand it. I think we have to suppress all the documentation found in the vehicle. To be quite frank, I don't know if we can suppress human beings, but I honestly think you have to suppress everyone who was in the vehicle or who claims they were in the vehicle because that is the way in which the government found out about their very existence in this case. Thank you. We'll hear from you on the rebuttal. Thank you, Your Honor. May it please the Court, good morning. I'm from the Parliament on behalf of the United States. Pierre Petit. Then I'll address the first issue that appellant posed, and that was the issue of Harvard. The evidence in this case to support Harvard that the jury found was that Ms. Silpius actually shielded defendant Jean when Agent Harrison came to the Residential Surgery Department. We don't know that Jean was in the residence. There's no evidence that he was there. How can the case be made that she shielded him? Well, the testimony was that when Agent Harrison approached the driveway and the door, he heard the bushes break. Silpius slammed the door. He asked the question, was that Silpius? Was that Jean, excuse me? And her response was, I don't know. He said, I don't know. No. Where is that in the, I'm looking at what I thought was the proper place, 227. And then you indicated you heard footsteps. I did. Bush breaking. But is it true, sir? Is it not you did not see Dorsonville Jean running? No, ma'am. No further questions. I would say the exact opposite of that. Maybe if you could do that while Mr. Caddy has his rebuttal, and then we could throw that in at the very end. I don't want to take your time doing it. Well, Mr. Carter, what if she did know? Mr. Caddy seems to say he had a right to be there because he was on the lease. Well, the issue of whether or not he was on the lease, I don't think that was the main argument for this case. Even if he was on the lease. Well, then he says there's no harboring because he had a right to be there. In other words, she was not concealing him from authorities. He had a right to be there because he was a tenant. Technically, even if his name was on the lease, his name being on the lease does not permit her to have agents, to lie to the agents, in effect, as to whether or not he was the one who was just running to the house or running to the bus station. By her doing that, she permitted Jean to get away. She permitted Jean to conceal himself either inside the residence or in the buses. Did she actually have a responsibility physically to keep him from getting away? I do not say that. You said she let him get away. And I ask, does she have a responsibility physically to keep him from getting away? Well, she has a responsibility not to be involved in letting him get away. And this was her involvement in letting him get away? But what evidence do we have that it was him, that he was anywhere near there? Is there any evidence other than her shutting the door? And you can shut the door in an agent's face for a lot of reasons. You just don't want to be bothered or you have something on the stove or whatever. But what basis do we have that the jury could use to infer that he was present and she was in fact concealing? Did the jury know that Jean was living in that house? Did the jury know that Jean was illegal, illegal living? Did the jury know that Harrison went to the house in search of Jean? Did the jury know that there was bushes being broken and someone was running either in or out of the apartment? Well, we don't. I don't think it's quite that specific. It's pretty general. But, but your Honor, the jury also heard Ms. Silvia's testimony. And she put all credibility on the line. And obviously the jury did not believe when she said that that was not Jean who was either running in or out of the house. They did not believe her. And based on that, a reasonable juror, I think the standard is if any reasonable juror could believe that that was in fact Jean who she was attempting to shield or to protect, then there was sufficient evidence and this Court should not intervene in a juror's decision. What if she said nothing? What if the police or your agent said, is that Jean? And she said, I'm not talking to you. That may have been a different case altogether. But when she intervened, when she made a specific denial that that was not him, and then when she testified and put all credibility on the line, and considering the story that she gave in her general testimony at trial, the jury had more than sufficient basis to infer, number one, that she was lying, finding that she lied in her entire testimony that she gave at trial. And based on that, there's a reasonable inference could be made by that jury that yes, that was Jean, and yes, she was attempting to shield him from Agent Harrison. Counsel, what's striking about this case is how open this was. We talked about concealment, but he was on the lease. The government obviously had the lease because they turned it over in discovery. Everyone knew where he was. And we're all basing this on whether Bush's cracking was Jean or not. I mean, what's the reality of this? He was on the lease, but every time that the agents went in to find him, they never found him. Let me ask you, I mean, what about if the landlord knew that he was an illegal alien? He paid his rent and he's on it and they have a lease agreement. Did she charge him as well as Hartman? If she made attempts to shield him. If the agents came and said, you know, landlord, Jean is an illegal alien. He should not be on the lease. And then somehow the agent goes to the apartment and the landlord says something and does something to prevent the agents from finding him. That's exactly what happened in this case with Silvius. It seems that there's some conflicting facts. I thought your brief also said that there was a thought he was still in the house. And yet your brief also said he was running out. If they were sure he was running out, why didn't they just go after him? They heard Bush's cracking. It's a hard case to understand. Well, they heard Bush's cracking and they heard the door slam. And to me it was not clear from the trial whether Jean was running out of the apartment or he was outside and running into the apartment. But it doesn't matter whether he was running out or in. The issue is whether or not Silvius said or did something to prevent Harrison from further pursuing Jean. And the evidence in this case, I think, strongly supports that fact. Particularly given the overall general testimony of Silvius and the jury getting to listen to her, getting to see her, and getting to judge her credibility. Would you address the validity of the stop and the arrest on Orange, please? Yes. Is this for research? I would argue, arguably, it's not for research. But it was a search incident. When the agents, the agents had reason to believe from the tipster that Jean and Silvius were in St. John bringing illegal aliens back from St. John to St. Thomas. But we have held, the United States v. Roberson, and I know because I was reversed by the Third Circuit, by Judge Becker on that case, that an anonymous tip that someone is somewhere doing something illegal cannot form the basis for an arrest. This was more than an anonymous tip. We call it Jean was a fugitive. Jean was wanted by INS or by ICE. Somebody called and said, I know where Jean the fugitive is that you're looking for. He's in St. John. For all we know, that person just had it in for Jean and wanted Jean to get arrested. That was the problem in Roberson. You don't know unless there's something to bolster the reliability of this tip. And we don't know anything about this tipster. Well, the testimony at trial was that two weeks prior that this same person had again called the agents and told them that Jean was again at St. John. He was again moving illegal aliens. They were not able to confirm that at the time. Then two weeks later, here comes another call. I don't know how that bolsters the reliability. Well, this time they get the description of the vehicle. They say what kind of vehicle is leaving St. John. They say who was in the vehicle with him. But when they arrive at the scene and person called Jean is not in the car, doesn't that give pause as to whether the tip was in fact reliable? Well, when they approach the vehicle, the ax still is. But where's Jean? And she says, oh, he stayed back in St. John. He got off the car in St. John. He stayed in St. John. The agents see a pair of pants in the front seat. And then the agents hear that Jean jumped overboard and is now swimming or treading water in the ocean. It's more than sufficient basis for the arrest of these individuals and for the search that happened subsequent to that. There were two other individuals in the back seat of the SUV. There were two other individuals in the back seat of the SUV. Were they seated visibly to the agents? There was a plain view of the agents in the back seat. The agents took them out, put them in a detention van, went to retrieve Jean from the water, took the two supposedly illegal aliens back to the station, got an interpreter, interviewed them. They determined that they were, in fact, illegal aliens. My understanding was at that point, they were placed under arrest. And two days after that, the vehicle was searched. Yeah, and that was a search incident to arrest, which seemed to me to be very strange, to have a two-day later search. It seemed that that would have to be an inventory search. Was there any evidence that the officers arriving on the scene, and I guess that would have been, well, the two officers arriving on the scene could tell from looking in the car that these people were Haitians, illegal Haitians. They couldn't tell that at the scene, could they? At the scene, no. At the scene, I think the testimony from Officer Rogers was that they appeared confused, disoriented. And based on the totality of what was going on with Jean being in the car, with the pass being in the front seat, with the other agent saying that he had seen Jean in the water, the conclusion was, and I think it's a reasonable conclusion, that, a reasonable inference, that these were, in fact, illegal aliens. And it was borne out when the two illegal aliens were taken to the IMS and were questioned. And based on that, there's more than sufficient evidence in the record to support the search. And I think the statement is that... On this border search issue, what do we do with that? I mean, the judge... Did the judge apply the wrong standard? How do we deal with that? Well, you know, I don't think that that was the primary reason for the judge's decision. I think the ultimate decision, the first and primary decision that the judge came to was his view that this was a search incident to allow for the arrest, in terms of the search. In my view, the fallback position was... And also, it's a border search. Border search. And to put this in context, this suppression hearing was held on the eve of trial, the morning before trial. The suppression motion was filed the morning of trial. So, neither counsel or the judge had the full benefits of receiving a motion from an appellant in this case. And I think both parties were... The government and the court was kind of taken off-guard by the whole thing. And we may or may not have been shooting from here for certain issues. But the primary issue as to whether or not the search was done incidentally to allow for the arrest or as a result of an intentional search, I think there's more than sufficient evidence in the record to support that. All right. Thank you very much. Thank you. Good morning again. Yeah. Addressing the government's point very quickly about Ms. Silveia's closing the door, and I agree. Is he inside the house? Is he outside the house? They're arguing both sides of the issue. Either she's interfering with their investigation because he's in the house and he closed the door, but the whole basis for believing he's there is because they heard branches breaking outside the house. I know there's two sides to every story, but the government, I don't think, can argue both sides of this at once. As to whether or not... Well, fairness, he did say that the possibility is that she came from the outside into the inside, in which case it may be consistent. And based on your question, it's all speculation. We have to kind of make something up to try to make the government's case work, and proof beyond a reasonable doubt requires much, much more than that. And here all we have is speculation that he was inside the house or outside the house, in addition as to whether or not Ms. Silveia said or did anything to inhibit the government from apprehending Mr. Gene. Agent Harrison testified several times that the fact that he was there aided him in apprehending Mr. Gene, and there was no testimony whatsoever that somehow her closing the door inhibited the government from apprehending Mr. Gene. There's just absolutely no evidence that he's even in the house. And as Your Honor pointed out, there's a million reasons someone can close the door. The government never stated that that in any way inhibited them from apprehending Gene, and the government had to prove that because it has to prove that her action somehow substantially facilitated his stay in the United States illegally. The status of your case may depend on how we view the term harboring. How would you define harboring for us so that we would know how to decide this case? I think it's quite clear and it's quite clear in the instruction. It's to provide shelter is the first thing. To harbor, you have to provide shelter, and that shelter has to substantially facilitate the illegal aliens remaining in the United States unlawfully. And that's what the judge charged, too. That's exactly what he charged. The jury just flat out got this one wrong. There was nothing in the record to support his conclusion. I understand there are certainly some legal issues as to a lease and maybe the jury. That was something that went over the jury's head. But he had every right to be in that property as against Rosalynn Solvay as against the landlord. So we don't have to worry about whether the term concealing is part of the definition of harboring or not? I don't think that harms the appellant's case either way because, as the agents all said, this is a very wide-open living arrangement. Ms. Solvay is actually working with immigration. They know Mr. Gene is in that house, so they can't conceal him. There's nothing clandestine about his living in the home. A couple of points I didn't get to is the amazing Mr. VanCole. The government, of all the witnesses put on the stand, the agent, the Ms. Supreme, everyone is in the car. No one says that Mr. VanCole is in the car. The agent actually testifies that he drives the car. He can see the entire interior of this vehicle, including the trunk. And he's not in the vehicle. Mr. VanCole appears like a meanie a couple of days later and says, well, I was in that car, too. This is a situation where Mr. VanCole, he wanted to get some benefit from the government. I helped out Agent Harris and said, I'm going to remain in the United States. I think that's exactly what happened here. I know that it's not the court's decision to make veracity conclusions, but it's so far-fetched. This is absolutely unsupported by anything in the evidence that he was in any way in that vehicle. And I don't think that specifically in that one they can even prove they did anything to harbor him or to transport him. I see my time is up. Thank you, Your Honor. Thank you, counsel. The case was well argued. We'll take it under advisement.